

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-21-00301-CV

---

RONNIE GONZALES, APPELLANT

V.

LUBBOCK COUNTY HOSPITAL DISTRICT
D/B/A UNIVERSITY MEDICAL CENTER, APPELLEE

---

On Appeal from the 286th District Court
Hockley County, Texas
Trial Court No. 180825539, Honorable Pat Phelan, Presiding

---

December 29, 2022

## OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Appellee, Lubbock County Hospital District d/b/a University Medical Center (UMC), sued Appellant, Ronnie Gonzales, a resident of Hockley County, for unpaid medical care. Based on a jury's verdict, the district court rendered judgment in favor of UMC for the sum of $58,931.46. On appeal, Gonzales claims the district court reversibly erred by excluding evidence of what he would have paid had he been insured by a health care plan contracting with UMC and evidence of UMC's actual costs for the services he received.

We hold that the trial court did not abuse its discretion in excluding this evidence from the jury's consideration. We therefore affirm the judgment.

Background

Health insurance has dramatically changed during the past forty years. Under traditional "indemnity" insurance, a patient could demand medical service from a provider she selected, receive a bill, and then look to her health insurance company to pay all or a portion of incurred fees.[1] Many who received care in traditional indemnity plans viewed it in much the same way some college students perceive their parents paying their credit card bill: as a subsidy.[2] In 1980, more than ninety percent of the privately-insured population in the United States was covered by an indemnity insurance plan.[3]

By 1996, however, the share of individuals enrolled in private indemnity plans had shrunk to three percent.[4] The advent of "managed care" plans, such as health maintenance organizations (HMOs) and preferred provider organizations (PPOs), attempt to control health care costs by changing the manner in which services are delivered and paid for. Managed care insurers commonly contract to restrict which providers are "in network," make payment to providers at pre-negotiated rates, and

---

[1] Mark V. Pauly, *Insurance Reimbursement*, in HANDBOOK OF HEALTH ECON. vol. 1A 541 (Anthony J. Culver and Joseph P. Newhouse, eds., 2000).

[2] This, in turn, incentivized patients to incur more health expenses. *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 227 (3d Cir. 2020) (citing J. Scott Andresen, *Is Utilization Review the Practice of Medicine? Implications for Managed Care Administrators*, 19 J. LEGAL MED. 431, 431 & n.6 (1998)); CAM DONALDSON & KAREN GERARD, ECON. OF HEALTH CARE FINAN.: THE VISIBLE HAND 91 (2005); Mark V. Pauly, *The Economics of Moral Hazard: Comment*, 58 AM. ECON. REV. 231–37 (1968).

[3] *See* Sherry Glied, *Managed Care*, in HANDBOOK OF HEALTH ECON. vol 1A 591 (Anthony J. Culver & Joseph P. Newhouse, eds., 2000).

[4] *Id.*

implement utilization management practices to oversee treatments an insured can obtain.[5]  According to data gleaned from recent economic studies, the terms insurers negotiate with providers can vary widely for the same service within the same hospital, and appear to have no predictable relationship to the prices paid by "self-pay" patients with no insurance discount.[6]  As a commentator quips, "If you've seen one managed care plan, you've seen one managed care plan."[7]

This background offers a context for the issues at play in the present appeal. Gonzales, an employee of Friona Industries, was enrolled in the Friona Industries Health Care Benefit Plan ("FIHCBP").  FIHCBP covered "practitioner only" services, meaning it had negotiated contracts with doctors only.  Because it did not contract for its enrollees to receive services at hospitals, it negotiated no discounted fee with these facilities.[8]

In January 2017, Gonzales presented at a Lubbock, Texas clinic after suffering a persistent headache.  He received some pain medication and returned home.  Upon presenting to the clinic again the next day, the physician directed Gonzales to go immediately to the emergency room.  Gonzales traveled to the UMC hospital emergency

---

[5] *See also* Sherman Folland, Allen C. Goodman, & Miron Stano, THE ECON. OF HEALTH AND HEALTH CARE 244 (5th ed. 2007); Eric R. Wagner, *Types of Managed Health Care Organizations*, in THE MANAGED CARE HANDBOOK 13 (Peter R. Kongstvedt, ed., 1989).

[6] *See* Gerardo R. Sanchez, *Variation in Reported Hospital Cash Prices Across the United States and How they Compare to Reported Payer-Specific Negotiated Rates*, 211 ECON. LTRS. (Feb. 2022); Stuart V. Craig, Keith M. Ericson, and Amanda Starc, *How Important is Price Variation Between Health Insurers?* 77 J. OF HEALTH ECON. (May 2021).

[7] Glied at 711, citing Roger Feldman, John Kralewski, & Bryan Dowd, *Health Maintenance Organizations: The Beginning or the End?* 24 HEALTH SERVS. RES. 191–211 (1989).

[8] Instead, Gonzales's insurance card indicated, "Participants are not limited to a set group of providers.  The plan will simply reimburse providers on a set fee schedule as outlined in the plan document." The card also stated, "THIS CARD IS NOT A GUARANTEE OF COVERAGE."

department in Lubbock and presented his FIHCBP health insurance card. He acknowledged at trial that he understood UMC would expect to be paid for services. He signed a "Financial Agreement/Assignment of Benefits," which reads in relevant part:

> FINANCIAL AGREEMENT: I acknowledge that I am legally responsible for all charges in connection with the medical care and treatment provided to me by UMC Health System, physicians, and other healthcare providers. I promise to pay UMC and any physicians and healthcare providers all costs and charges for these services in accordance with bills and invoices presented. If the account is referred to an attorney for collection, I shall pay reasonable attorney's fees and collection expenses.

A hospital employee mistakenly indicated on the form that UMC appeared to be "a participating provider for my insurance." Gonzales initially said that based on this statement he thought his health insurance would cover most of the care and that he would pay the remaining deductible. At some point, though the parties dispute when, UMC discovered the error and informed Gonzales. Gonzales acknowledges "at some point" he knew the hospital was actually "out of network" but continued to use UMC for treatment thereafter.

Gonzales received treatment from UMC's staff as an inpatient for six days. After his discharge, Gonzales returned to UMC on four occasions to receive additional radiological scans (two visits) and laboratory tests (two visits). Before receiving outpatient radiology services, Gonzales signed financial agreements identical to that executed in January 2017.

At trial, UMC's director of patient financial services, Amy Eade, testified about the charges Gonzales incurred during his inpatient and outpatient treatments. UMC maintains a "chargemaster" – a price list categorizing more than 9,000 goods and

4

services – which serves as the baseline charge for all patients who receive treatment at the hospital. UMC determines its chargemaster rates by comparing it to the fees charged by five other hospitals. Eade testified that when health insurance plans negotiate contracts with UMC, the hospital's discounted charges are made from the original chargemaster amount. Because UMC had no contract with FIHCBP, however, the hospital did not discount the price of its services for Gonzales's care. All told, UMC billed Gonzales $71,546.10 according to its chargemaster rates, received payments or credits totaling $9,623.08, and made a billing reduction of $2,991.56. When Gonzales refused to pay the $58,931.46 that UMC contended remained as a balance, the hospital filed suit in August 2018 under theories of breach of contract, suit on account, and quantum meruit.

Benedicto Baronia, M.D., testified that the services rendered by UMC were necessary; Gonzales conceded the same during his testimony. Eade opined without objection that the charges obtained from the chargemaster and reflected in Gonzales's billing statements were reasonable rates. UMC's contract and quantum meruit claims were submitted to the jury, who found that Gonzales contractually agreed to pay UMC for goods and services rendered during his January 2017 inpatient admission and two outpatient radiological studies; it found that Gonzales owed a contractual balance of $53,832.63. The jury also found in favor of UMC under a quantum meruit theory, finding Gonzales owed a balance of $53,832.63 for inpatient and radiological services, plus $5,098.83 for unpaid laboratory services. Because the quantum meruit theory afforded

the greater recovery to UMC,[9] the district court rendered judgment that UMC recover from Gonzales the sum of $58,931.46, as well as post-judgment interest.

Analysis

Gonzales does not complain on appeal of insufficient evidence supporting the jury's verdict and resulting judgment. Rather, the core of Gonzales's first argument regarding both the contract and quantum meruit claims is that UMC was required to charge him a "reasonable price"; ergo, the district court should have admitted evidence of the discounted amount that UMC contracts to accept from other health insurers.[10] An appellate court reviews a trial court's exclusion of evidence for an abuse of discretion.[11] An erroneous ruling requires reversal only if a review of the record reveals the error was harmful.[12]

The only portion of the available record where the district court may have excluded evidence of UMC's discounted fees appears during an offer of proof on the second day of trial. Gonzales's counsel sought admission of five exhibits and testimony reflecting the amount UMC would have accepted from other insurers for the same services if Gonzales had been enrolled in their health insurance plans. The following colloquy occurred:

> THE COURT: Okay. Anything else on the offer of Proof?

---

[9] *See Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex. 1987).

[10] Gonzales's argument is premised primarily on the Supreme Court of Texas's holdings in *In re K&L Auto Crushers,* 627 S.W.3d 239, 244 (Tex. 2021) (orig. proceeding) and *In re N. Cypress Med. Ctr. Operating Co.,* 559 S.W.3d 128, 134 (Tex. 2018) (orig. proceeding). Ordinarily, "[t]he measure of damages for recovery under a quantum-meruit theory is the reasonable value of the work performed and the materials furnished." *Hill v. Shamoun & Norman, LLP,* 544 S.W.3d 724, 733 (Tex. 2018).

[11] *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015).

[12] Tex. R. App. P. 44.1(a)(1).

6

[GONZALES'S COUNSEL]: No additional – no additional exhibits or testimony on the Offer of Proof, Your Honor except at this time we would renew the defendant's request to offer this testimony in front of [the] jury and to have the exhibits offered in front of the jury and we believe that that's required by [*In re North Cypress* and *In re K & L Auto Crushers*], and because the – the testimony about the amount that's accepted as payment in full is relevant to determine the value of those services and what value is reasonable.

THE COURT: All right. Anything else?

[UMC'S COUNSEL]: Your Honor, we would just indicate as we, earlier as to why these should not be admitted into evidence and before the jury.

THE COURT: Okay. Overruled.

\* \* \*

[GONZALES'S COUNSEL]: And, Your Honor, just so we have a clear record we renewed our request for these documents to be exhibited in front of the jury and for that testimony to be admitted before the jury and my correct understanding is that the Court overruled that.

THE COURT: Yes.

The appellate record does not indicate when the district court excluded Gonzales's evidence at an earlier time which led to counsel's renewal. Moreover, the record does not reflect that the district court's rationale for its ruling was based on relevance grounds,[13] though that is the theory urged on appeal. When a trial court does not specify the ground on which it excludes trial evidence, we will affirm the trial court's ruling if any ground is meritorious.[14]

Although Gonzales urged the trial court that the amounts paid by other insurance carriers is relevant to determining the "value" of the services provided to Gonzales, value of services was not the question posed to the jury. Rather, in Question 5 of the court's

---

[13] TEX. R. EVID 402 ("Irrelevant evidence is not admissible.").

[14] *K-Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex. 2000) (per curiam).

7

charge (relating to quantum meruit), the jury was asked to determine "the reasonable *price* for the Medical Care and Treatment provided by UMC to Gonzales[] which remains unpaid" for five dates of admission or service. (emphasis added). Gonzales lodged no objection to this portion of the court's charge, so the words contained therein guide our review.[15]

"Price" is neither a technical term nor defined in the court's charge, so we look to its commonly-understood meaning.[16] "Price" is defined as "the sum or amount of money or its equivalent for which anything is bought, sold, or offered for sale,"[17] which is different from "value," defined as "relative worth, merit, or importance."[18] Rule of Evidence 401 defines relevant evidence as that which (a) has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.[19] In light of the language in the charge, and because Gonzales fails to show how his proffered use of value evidence would make any matter of consequence more or less probable,[20] the district court did not err in excluding evidence of what other providers would have paid UMC if Gonzales had been enrolled in their plans.

---

[15] *See Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016) (citing *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000)).

[16] *Werner Co. v. DeVallee*, No. 02-19-00043-CV, 2021 Tex. App. LEXIS 2301, at *35–36 (Tex. App.—Fort Worth Mar. 25, 2021, pet. filed) (mem. op.).

[17] https://www.dictionary.com/browse/price (accessed Dec. 21, 2022).

[18] https://www.dictionary.com/browse/value (accessed Dec. 21, 2022).

[19] TEX. R. EVID. 401.

[20] Dorsaneo's Litigation Guide describes the distinction between "value" and "contract price" in quantum meruit cases:

> A claim in quantum meruit does not proceed on the contract for the contract price, but proceeds independently of the contract to recover the value of the services rendered or

8

Furthermore, even if such evidence had been relevant, the trial court could have properly denied its admission because any probative value would be substantially outweighed by a danger of "unfair prejudice, confusing the issues, [or] misleading the jury . . . ."[21] The amount a hospital agrees to discount its services from its chargemaster is only one part of the contractual negotiations between managed care insurers and providers. Permitting the jury to receive evidence of the negotiated prices between UMC and other insurers without the other corresponding considerations (such as patient volume, utilization management concessions, and payment terms) would omit a meaningful understanding for why the amount UMC charges for the same services varies among health plans, including Gonzales's insurer.

To use an analogy outside health insurance, consider that many consumers join membership clubs offered by warehouse retailers – such as Sam's Club or Costco – so that they can purchase goods and services at a price less than other retailers. No evidence about the extent of the member's "discount" would be accurate or complete without considering all costs to be borne (including barriers to participation, membership fees, bundling, etc.). Permitting non-member consumers to pay a lower sticker price simply because others do so would encourage free riding; consumers in Gonzales's shoes would avoid the burdens that enrolled members receiving discounts are required

---

materials furnished. A judgment based on quantum meruit must be supported by evidence of the reasonable value of labor or services performed and materials furnished.

2 William V. Dorsaneo III, TEXAS LITIGATION GUIDE § 218.03 (LEXIS 2022).

[21] TEX. EVID. R. 403.

to bear.[22]  Because Gonzales's proffered evidence omitted this crucial additional information, the district court could have properly denied its admission pursuant to Rule 403.

We acknowledge that the Supreme Court's decisions in *In re K&L Auto Crushers* and *In re North Cypress* permit parties to obtain discovery about a hospital's reimbursement rates from other insurers, consistent with Texas Rule of Civil Procedure 192.3(a).[23]  Indeed, it might be impossible to discover whether a hospital discounts its services for similarly-situated consumers if negotiated rates could never be obtained.  But permitting a party the ability to obtain information that "appears reasonably calculated to lead to the discovery of admissible evidence" is not the same as holding the information to be admissible at trial.[24]  We hold the district court did not err in refusing Gonzales's request to admit evidence of UMC's negotiated discounts with other health insurers.

Next, we address Gonzales's argument that the district court erred in refusing to admit evidence of UMC's "costs" on relevance grounds.  At trial, Gonzales argued that evidence of UMC's "per capita cost of maintenance" was relevant because it pertained to "a statutory limitation on the recovery of the hospital" pursuant to the Texas Special Districts Code and Health and Safety Code.[25]  Gonzales does not advance the statutory

---

[22] This is a key distinction from that presented in *In re North Cypress.*  559 S.W.3d at 133 ("the issue is not whether Roberts may take advantage of insurance she did not have.").

[23] TEX. R. CIV. P. 192.3(a).

[24] *See In re Walmart, Inc.*, 620 S.W.3d 851, 858 (Tex. App.—El Paso 2021, orig. proceeding) (describing the distinction between relevance for purposes of discovery from admissibility at trial); *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 664 (Tex. 2009).

[25] TEX. SPEC. DIST. CODE ANN. § 1053.111(c) and TEX. HEALTH & SAFETY CODE ANN. §§ 282.061 & 281.071.  The gist of Gonzales's argument was that the Legislature prohibits governmental entities from "charg[ing] more than the cost and thereby becom[ing] a profit making agency."

cap argument on appeal. Instead, he urges that evidence of "costs" is a relevant factor for determining a reasonable price. A trial objection stating one legal basis may not be used to support a different theory on appeal.[26] Gonzales's offer of proof and argument about an alleged statutory cap on UMC's fees never told the trial court that such evidence was relevant to a "reasonable price" under the common law and the specific ground asserted on appeal was not apparent from the context.[27] Thus, the issue has been waived.

Having overruled all of Gonzales's dispositive issues on appeal, we affirm the judgment of the district court.

Conclusion

The judgment of the district court is affirmed.


Lawrence M. Doss
Justice

---

[26] TEX. R. APP. P. 33.1; *McKee v. McNeir*, 151 S.W.3d 268, 270 (Tex. App.—Amarillo 2004, no pet.) (holding that appellant waived complaint because issue on appeal did not comport with the argument made in the trial court).

[27] *See* TEX. R. APP. P. 33.1(a)(1)(A).